IN THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF OKLAHOMA


UNITED STATES OF AMERICA,      )
                               )
    Plaintiff,                 )
                               )
    -vs-                       )   Case No. CR-15-129-D
                               )
GREGORY JOHN MAUREK,           )
                               )
    Defendant.                 )



\* \* \* \* \* \* \*

TRANSCRIPT OF PROCEEDINGS

HAD ON SEPTEMBER 14, 2015, AT 10:00 A.M.

BEFORE THE HONORABLE TIMOTHY D. DeGIUSTI

U.S. DISTRICT JUDGE, PRESIDING

\* \* \* \* \* \* \*



MOTION TO SUPPRESS



Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.

CHRISTINA L. CLARK, RPR, CRR
United States Court Reporter
200 N.W. Fourth Street, Suite 5419
Oklahoma City, Oklahoma  73102
christina_clark@okwd.uscourts.gov - ph(405)609-5123

A P P E A R A N C E S


ON BEHALF OF THE GOVERNMENT:

     Ms. Kerry Blackburn
     Assistant United States Attorney
     U.S. Attorney's Office
     210 West Park Avenue
     Suite 400
     Oklahoma City, Oklahoma 73102


ON BEHALF OF THE DEFENDANT:

     Mr. David Autry
     Attorney at Law
     1021 N.W. 16th Street
     Oklahoma City, Oklahoma 73106

# I N D E X

**PAGE**

EVIDENCE ON BEHALF OF THE GOVERNMENT:

ROBERT ERDELY
    Direct Examination by Ms. Blackburn . . . . . 05
    Cross-Examination by Mr. Autry . . . . . . . .40

GOVERNMENT RESTS . . . . . . . . . . . . . . . . 51

EVIDENCE ON BEHALF OF THE DEFENDANT:

KARI NEWMAN
    Direct Examination by Mr. Autry . . . . . . . 52

DEFENSE RESTS . . . . . . . . . . . . . . . . . .60

CERTIFICATE OF REPORTER . . . . . . . . . . . . .61

1          **P R O C E E D I N G S**

2          (The following proceedings were had September 14, 2015,

3   with Court, counsel, and defendant present:)

4          THE COURT:  This is the case of United States vs.

5   Gregory John Maurek, CR-15-129-D.  This is a hearing on the

6   defendant's motion to suppress evidence.

7       Appearances, please.

8          MS. BLACKBURN:  Kerry Blackburn on behalf of the

9   United States.

10         MR. AUTRY:  David Autry for Mr. Maurek, and

11  Mr. Maurek is present, your Honor.

12         THE COURT:  All right.  Thank you, Mr. Autry.

13      Mr. Autry, it's your motion.  Are you ready to proceed?

14         MR. AUTRY:  Yes, your Honor.

15         THE COURT:  Please do so.

16         MR. AUTRY:  Your Honor, Ms. Blackburn's witnesses

17  are here and available.  If she could present her witnesses,

18  if that's agreeable with the Court.

19         THE COURT:  Just have her present them and you

20  cross-examine them?

21         MR. AUTRY:  Yes, sir.

22         THE COURT:  Is that acceptable with you,

23  Ms. Blackburn?

24         MS. BLACKBURN:  That's fine, your Honor.

25         THE COURT:  All right.  Please proceed.

9:37:51:15 AM         1          MS. BLACKBURN:  Your Honor, the government calls

2     Detective Robert Erdely.

3          THE COURT:  Detective, please come forward, stand in

4     front of the witness chair and be sworn.

5          (The witness was duly sworn.)

6          THE CLERK:  Thank you.  Please be seated.

7                              **ROBERT ERDELY,**

8     called as a witness herein, having been first duly sworn,

9     was examined and testified as follows:

10                              **DIRECT EXAMINATION**

11    BY MS. BLACKBURN

12    Q    Sir, would you please state your name and occupation.

13    A    Robert Erdely.  I am a detective with the Indiana County

14    District Attorney's Office in Indiana, Pennsylvania.

15    Q    At this time, is that a full-time job for you?

16    A    It's a full-time job.  I can work full-time hours.

17    However, the reality is I work about half my month doing

18    casework as a detective and the other half teaching law

19    enforcement.

20    Q    With regard to the half of the month that you spend

21    working as a detective, are you assigned to a particular

22    division and certain job duties?

23    A    When I'm teaching?

24    Q    When you're not teaching.

25    A    Oh, I am the computer crime unit.  I am the only one.  I

9:38:56:27AM   conduct online investigations and -- where I find people

2   online committing crimes and ultimately execute search

3   warrants.  And also I conduct the computer forensics.

4   Q    With regard to those investigations, do you have a

5   specific expertise with regard to online investigations of

6   child pornography and related child sex abuse crimes?

7   A    Yes.  Throughout the years I have been to numerous

8   trainings and ultimately became a trainer in online

9   investigations for the Internet Crimes Against Children Task

10   Force.

11   Q    For approximately how many years have you worked, at

12   least as part of your job or prior to employment as a

13   detective, in the field of computer forensics or computers?

14   A    Over ten years.

15   Q    You indicated that you are a trainer.  In what areas are

16   you a trainer?

17   A    Online investigations, where we teach peer-to-peer

18   investigations, technology in general, which would cover

19   wireless networking, the interrogation of wireless routers.

20   Those are my primary areas of expertise.

21   Q    And what is peer-to-peer?

22   A    Peer-to-peer is literally computer to computer, from one

23   computer to another computer.  So on the internet, the

24   internet being a network of networks, there are different

25   file-sharing programs that allow a user to set up a program

9:40:22:18AM 1  and share files that they've created or to share files that

2  they've downloaded from other people.

3      So that's a general term which would cover many different

4  programs.  BitTorrent is specifically one of those

5  peer-to-peer file-sharing networks.

6  Q    With regard to your background and expertise, do you see

7  in front of you what's been marked as Government's Exhibit 1?

8  A    I do.

9  Q    Can you tell us what that is?

10  A    It's my CV.

11  Q    As of this time, is there anything that you think you

12  need to correct with regard to that document?

13  A    No.

14         MS. BLACKBURN:  Your Honor, the government would

15  move to admit Government's Exhibit 1.

16         MR. AUTRY:  No objection.

17         THE COURT:  It's admitted.

18  Q    (By Ms. Blackburn) Now, you said you train.

19  Approximately, how many hours or instances a month do you

20  train other individuals?

21  A    At least two weeks out of the month, so ten days, eight

22  hours a day.  That's an average.  And I have been doing that

23  for -- I am involved more heavily in training over the past

24  three years.  However, I have been training law enforcement

25  for in excess of six years.

DIRECT EXAMINATION OF ROBERT ERDELY

9:41:30:18AM  Q    Have you ever had an opportunity to testify as an expert

2      in court with regard to peer-to-peer online investigations?

3      A    I have.

4      Q    On approximately how many occasions?

5      A    I think there were four I had listed in federal court,

6      but there has been more than that testified in all three

7      districts in Pennsylvania.  And I can't recall the other

8      instance, but there has been numerous times.

9      Q    You mentioned earlier BitTorrent.  Is BitTorrent a

10     commercially-available software or file-sharing program?

11     A    Yes.  It's freely available on the internet.  There are

12     many versions of the software that you don't have to pay for.

13     However, there are versions that individuals can buy and pay

14     for.

15     Q    Is there a corollary in law enforcement that is used to

16     do investigations with regard to BitTorrent?

17     A    Yes.  There is a whole network of law enforcement that

18     investigate network, plenty of which I have trained.

19     Q    With regard to BitTorrent in particular, is there a

20     particular program that is used to do the investigations?

21     A    Yes, there is.

22     Q    What is that called?

23     A    Torrential Downpour.

24     Q    On a day-to-day basis, what, if any, expertise or

25     experience do you have with Torrential Downpour?

9:42:48:12 AM 1    A    I was part of the development team of that program.  We

2    partnered with University of Massachusetts Amherst and

3    developed the software.

4    Q    With regard to the software, is there ongoing

5    maintenance, for lack of a better word, or upkeep that

6    somebody is in charge of with regard to that software program?

7    A    Yes.  I run the law enforcement system which helps it

8    run.  I am the administrator.

9    Q    You indicated that you do law enforcement training.  Is

10   Torrential Downpour one of the softwares that you do training

11   for?

12   A    Yes, I do.

13   Q    With regard to that training, at the end of that training

14   are law enforcement individuals provided with a certification

15   that would allow them to operate that software?

16   A    Yes, they do.

17   Q    This software, is there a charge for you to provide this

18   software to law enforcement?

19   A    No.  The software is free to law enforcement.

20   Q    With regard to your testimony here today, are you

21   charging an expert fee to testify?

22   A    I am not.

23   Q    What, if any, compensation are you getting for this?

24   A    Just covering my expenses to be here.  There is no other

25   compensation.

9:44:06:15AM 1        MS. BLACKBURN:  If I could have -- turn on the

2    overhead, please.

3    Q    (By Ms. Blackburn) Detective Erdely, in preparation for

4    coming here today, did you put together a slide show to help

5    demonstrate and explain the softwares?

6    A    Yes.

7    Q    In front of you or on the screen, there appears to be a

8    slide.  Is that slide part of the presentation that you

9    prepared?

10   A    Yes, it is.

11   Q    With regard to BitTorrent, can you describe for us what

12   is displayed on this first screen?

13   A    This is just several pieces of software that operate on

14   the BitTorrent file-sharing network.  So BitTorrent is the

15   network or the networking protocol.  It's the rules that a

16   program would have to follow in order to properly operate on

17   this network.  Just like you have web servers that would share

18   our web pages, if you follow the web service protocol, I could

19   write a browser like Chrome or Microsoft or Explorer.

20        So these are the actual applications that would run on

21   the BitTorrent network.  And it gets a little confusing

22   because you see BitTorrent in the upper left.  Well,

23   BitTorrent is the protocol.  It's the method in which the

24   files are shared, but it's also a company and a program.  So

25   these are some of the more popular clients that are out there.

9:45:33:09AM  Q    When you say "client," does that mean that this is the

2    software a person would get in order to be able to run

3    BitTorrent?

4    A    Yes.  You can download much of the software for free.

5    Again, some of them have paid versions.  You would install it

6    into your program.  So any time I say the word "client,"

7    "application," or "program," those are all synonymous.  It's

8    the program running in Windows or a Mac-operating system that

9    would allow you to share files and download files on the

10   BitTorrent file-sharing network.

11   Q    In this particular instance, there is one that appears to

12   be a frog with Vuze.  Is that one of those?

13   A    Yes, it is.

14   Q    Are there legitimate items that people can obtain with

15   this type of software program?

16   A    Yes.  The BitTorrent network first requires that a user

17   finds something referred to as a torrent file.  It ends in a

18   .torrent extension.  And what that is is the set of

19   instructions to the BitTorrent application or program on how

20   to get the files.  It's not the files themselves but the

21   instructions on how to get the files.

22       BitTorrent, many legitimate pieces of software are

23   delivered using this file-sharing network.  And this is one

24   example.  But it also illustrates how you have to find a

25   torrent file in order for the program to run.  It's a two-step

9:47:00:06AM  processor.  There is division there.

2       So this is a free operating system that's available.  And

3   instead of having a user tie up the bandwidth on the web

4   server, where this web page is hosted, a person could download

5   the torrent.  If you look in the lower left, it says

6   BitTorrent.  And then you see Ubuntu 1504.  And then

7   underneath that are all the different versions of the

8   software.

9       So once you click on that, a torrent file would be

10  downloaded to your computer.  At that point, just by double

11  clicking on that torrent file, it would load into whatever

12  BitTorrent program you had installed.  Vuze being one or

13  uTorrent.  And a user would see -- typically be prompted and

14  would see the file or files that he or she would be

15  downloading and be given an option to not continue the

16  download or to cancel the download.

17      But if they acknowledge they wanted to download it, at

18  times they will be prompted where they want to save it, things

19  of that nature.  But then the program would just start

20  working.  It would look at those instructions and begin

21  downloading that material.  So this is just one example of a

22  website where you would find a torrent file.

23  Q    Showing what's file number -- excuse me -- Slide No. 3

24  here, can you tell us what this demonstrates?

25  A    So this is a closer look at the file-sharing network, how

9:48:30:18 AM 1   it would typically work.  So in the upper left you see a web

2   page.  It's called The Pirate Bay.  That website still exists.

3   And what it is is an index -- a searchable index.  It's really

4   just a web page.  Just like you can search out web pages in

5   Google, on this particular website you can search out torrent

6   files.  And they're described.  So I could put in keywords and

7   find a torrent that contains material that I would be looking

8   for.

9        So after doing these searches, by clicking the link a

10   torrent will be downloaded just like the prior slide.

11        If we could move next.

12   Q    And, actually --

13   A    Oh.

14   Q    -- just to go back for a moment, when we are talking

15   about this, are you talking about the commercial version of

16   the software and how it works or the law enforcement version?

17   A    This is the commercial.  This is the typical process to

18   download material and share material on the BitTorrent

19   file-sharing network.

20   Q    Now, you referred to both Pirate Bay and Google.  Can a

21   person find torrents outside of something like Pirate Bay?

22   A    Yes, they can.  The Pirate Bay is a website dedicated to

23   finding BitTorrent material, but I could use Google and search

24   for whatever topic:  Illegal copywritten music.  If I search

25   for torrents -- AC/DC torrent -- AC/DC being a group -- then I

9:49:55:27 AM  could potentially see a list of torrents that would be their

2  songs or albums to download.

3      And so once I search the material, whether it's through

4  this website or any other website, and I find a torrent,

5  again, I would just have to download the file that ends in the

6  .torrent extension.  That's what you see here as we've

7  advanced in this particular slide.

8      So once a user double clicks that torrent file, it

9  actually loads the instructions on how to get the files into

10  the file-sharing program, the BitTorrent program.  And inside

11  that torrent are addresses of a server that's referred to as a

12  tracker.  So torrents have a unique identifier that makes

13  it -- that collection of files extremely unique that there is

14  really no possibility of a -- of two different torrents having

15  the same value except to be the same.

16      So the program -- the file-sharing program would connect

17  to this tracker and ask a question.  Regarding this unique

18  torrent, this -- it's just a string of characters -- letters

19  and numbers -- can you provide me download candidates?  In

20  other words, IP addresses that have been reported as sharing

21  this content.

22      And so that's what you see here, the line drawn from the

23  peer to the tracker is the BitTorrent application contacting

24  the tracker trying to find IPs that have the material.  And

25  it's done -- and the way it does that is that the software

*DIRECT EXAMINATION OF ROBERT ERDELY*

9:51:42:15 AM  makes a direct connection to the tracker and then the IPs

2  would be delivered to the file-sharing program.  And so that's

3  where we're at right now.  We are just getting a list of

4  potential download candidates.

5  Q    And when we are talking about somebody going to one of

6  these torrent index websites, that's one way to get torrents

7  and material on an individual's computer; is that correct?

8  A    Yes, ma'am.

9  Q    Additionally, is there a way for individuals to create

10  their own torrents so that they then have -- don't have to

11  download files but they have created files on their computer?

12  A    Well, yes.  So someone initially has to start sharing the

13  material.  So if I had a collection of files and I wanted to

14  share it to anyone on this file-sharing network, most of the

15  BitTorrent applications gives a user a way to create their own

16  torrent file.

17       So if I had a folder full of movies, I would just simply

18  point my BitTorrent application to the folder full of movies

19  and it would create a .torrent file.  The only piece that

20  would be missing for me to actually start sharing that

21  material is I would have to get the torrent out there.  And so

22  I would upload it to sites like The Pirate Bay so that other

23  people could search for it, find it, and ultimately download

24  it.

25  Q    Are there incentives built in such that individuals would

9:53:04:21AM  1    want to share?

2    A    The incentives are actually built into the rules, the

3    file-sharing network rules.

4         It's a tit-for-tat exchange.  I am expected to give

5    pieces of a torrent that I'm downloading if the person I'm

6    connected to needs it, and they're expected to give me pieces

7    back, the pieces that I yet need to complete the download

8    process.

9         So, yes, it would download quicker when you're sharing

10   material.  People are going to give me the pieces -- more

11   inclined to give me the pieces of that collection of files

12   that I'm still lacking or needing.

13   Q    When you say "inclined to," is that something that

14   happens automatically with the software or something that an

15   individual user has to do in order to facilitate this?

16   A    It automatically happens.  It's built in to the

17   BitTorrent file-sharing protocol.

18        So now that I have the download candidates -- I have

19   downloaded a torrent, it's loaded into my program, I have

20   connected to a tracker and received download candidates --

21   then I can start connecting to these candidates.  And what

22   happens is the first thing I am going to do is confirm

23   through -- it's a networking handshake.  We are just going to

24   basically say hello.  And when I say that, it's the program is

25   doing this automatically.  Confirm that we're talking about

9:54:31:24AM the same torrent.  I have a torrent I'm interested in getting

2    pieces for.  They would respond and confirm that they also

3    have that torrent.  And we do some handshaking.  And there are

4    slides upcoming that would further explain that.

5        And then ultimately I would report to the sharing client,

6    if I'm running software, the pieces that I'm sharing, and they

7    would in return tell me the pieces that they had and they were

8    sharing.  And I would make requests of those pieces.

9    Q    By doing that, what happens then?

10   A    And then the exchange starts.  In the typical -- the

11   standard BitTorrent client, you can see two more lines were

12   drawn there.  And it looks semi-chaotic off to the right, but

13   that's that give-to-get exchange.  The normal file-sharing

14   program will try to download from many clients at once because

15   it speeds up the downloading process.  It adds redundancy and

16   full tolerance to the network.  So if there is 100 people

17   sharing it and one person goes off-line, I could still get the

18   material.

19       So that's trying to show the peer on the left not only

20   finding multiple clients to download pieces from, but in turn

21   sharing back to those peers, which are just other computers

22   online running BitTorrent software.

23   Q    Is it fair to say that if there are a hundred people

24   sharing then you are then having a direct connect with a

25   hundred other computers because you are drawing from each of

9:56:14:12 AM

1    those sources?

2    A    Correct.  The network -- that's how it's designed.  The

3    average everyday client that is free or that you pay for, we

4    directly connect from computer to computer.  We do that

5    handshaking to make sure we are talking about the same

6    torrent.  We exchange information about the pieces we are

7    sharing.  And then the file transfer happens.  It's all done

8    through a direct connect.  That's the standard BitTorrent

9    client.  That's how it's built.

10   Q    And we talked about the commercial version here.  Do you

11   also have a slide to explain how the law enforcement version

12   of the software works as well?

13   A    I do.  It's the next slide.

14   Q    Can you tell us what this shows?

15   A    So in law enforcement we have been investigating this

16   network for approximately three years.  And over time law

17   enforcement, primarily me, we have identified torrents that

18   contain illegal material, child pornography.  So me being the

19   administrator of a system and as one of the trainers, I have

20   all these torrents that we have amassed through searching for

21   them and through investigations.  Because if I conduct an

22   investigation and seize a computer, I can potentially learn

23   about 10, 20, maybe 100 other torrents that I didn't know

24   existed before that.

25        So the whole part of the BitTorrent network that I just

9:57:45:09AM   showed you, the first part where we had to seek out these

2   torrents, we don't need to do.  I have the torrents that

3   contain the illegal material.  So I can give that to an

4   investigator who wants to conduct peer-to-peer investigations.

5   So that's why there is a red "X" drawn through that.

6   Q    When you say that you can give it to them, does that mean

7   it's given to them by you contacting them directly or through

8   the software itself?

9   A    Through the software itself.

10   Q    So, essentially, it's built into the software that you

11   use?

12   A    Yes.  The process to get the torrent, investigate the

13   torrents is built into the software.  And that's what that

14   says.  No need to download the torrent.  I give them the

15   torrent.

16   Q    And what way, if any, does it differ on the tracker

17   portion?

18   A    So the second step of this, once it loads -- once we load

19   a torrent into the BitTorrent application, the typical

20   mechanism to identify download candidates would be to contact

21   a tracker.  So in lieu of that, we have law enforcement

22   officers searching for individuals sharing these torrents that

23   law enforcement possesses.  And these are the law enforcement

24   officers that were trained to do and conduct these

25   investigations.

*DIRECT EXAMINATION OF ROBERT ERDELY*

9:59:08:09AM 1    So we put in place a system -- a law enforcement system

2    where my search results could be seen by and shared to other

3    law enforcement.  Because the internet as a whole doesn't

4    really care about distance like we're traditionally used to.

5    If I'm searching for download candidates of a particular bad

6    torrent, I am just as likely to see someone in California

7    sharing that material as I am in Pennsylvania.

8        So if we share our search results, that investigator in

9    California that maybe sees someone on an IP address that is

10   believed to be in Pennsylvania, if he can just tell me about

11   that IP address, I can use it as an investigative lead or

12   investigative starting point.

13       I trained this way and I, myself, in using this software,

14   give that search result no more weight than I would an

15   anonymous phone call.  Because the tool is designed to then

16   try to connect to this IP address and confirm firsthand that,

17   yes, the IP address does, in fact, have the torrent that

18   someone else saw as a search result.

19       So I don't need to go to trackers.  Law enforcement will

20   share these search results, and I'll take that IP address, use

21   it, and confirm through a direct connection like the standard

22   client.  The only difference is law enforcement told me about

23   the IP address instead of a tracker.

24       And I do a direct connection to the peer like the

25   standard software.  We do a handshake like the standard

10:00:51:06AM   software.  And then we download the material from the sharing

2   client.  And that's confirmation to this information that I

3   received from somebody else.

4   Q    I went ahead and had her go forward.  I think we stepped

5   forward one click there.  You started to describe the download

6   process.

7   A    So then I download from the IP address or the peer that I

8   had learned about, assuming he's online, assuming he's still

9   sharing that content, that particular unique torrent.  But you

10   notice there is only one line here and the second and third

11   line wasn't drawn.  That's because although there is peers

12   surrounding what is labeled the suspect computer, we do

13   something in law enforcement -- and this is true with all of

14   our peer-to-peer tools -- we do something called a single

15   source download.

16        Instead of speeding up the download process and getting

17   the pieces from many sharing computers, I'm just going to

18   continually ask the same IP address for pieces I need.  And if

19   he doesn't have a piece or he goes off-line, that's when the

20   investigation would stop.  In that way, I know that all the

21   material downloaded came from that one computer.  It's really

22   just as simple as only asking one IP address.  And we are

23   being more restrictive on ourself as law enforcement than the

24   standard client is.  Because a standard client would download

25   from multiple sources and it would happen very quickly

DIRECT EXAMINATION OF ROBERT ERDELY

10:02:27:27AM  typically.

2        If you wanted to turn your views being one standard

3   BitTorrent client into a program that could download from a

4   single source, you could very easily do that.  There is free

5   software that would restrict access to and from your computer

6   from a single IP address instead of multiple IP addresses.  So

7   what law enforcement has done programmatically inside the law

8   enforcement software, anyone could do with an IP-filtering

9   piece of software.  And there is free versions of it available

10  on the internet.

11  Q    Earlier you had spoken about the commercial software and

12  a direct connect.  The direct connect that is done with the

13  law enforcement version, the software, does it, for lack of a

14  better word, invade or go into the suspect computer more than

15  the commercial version of the software?

16  A    No.  We build a detailed log of the things that are

17  happening, but, no, the direct connection is the same.  In

18  order to do something like you're suggesting or asking if we

19  do, it's almost an inconceivable task.  Because there are so

20  many BitTorrent clients, I would have to find some

21  vulnerability, some back door -- whoever wrote Vuze, for

22  instance, maybe made a mistake in the programming and I could

23  get into secret hidden places of the computer.  Well, I would

24  have to find that same vulnerability in BitTorrent, in

25  uTorrent, in all the different applications.

*DIRECT EXAMINATION OF ROBERT ERDELY*

10:03:58:07AM          No, we do the same handshake, we do the same exchange of

2    data, and ultimately download the material in the same way

3    except in our software -- the transfer is the same.  We keep a

4    detailed event log to show when things happened, when the

5    material came to us.  The standard client -- I don't know of a

6    standard client that would have a detailed log, but I would

7    equate that to being, you know -- I'm law enforcement, I just

8    need to take good notes.

9    Q    Now, you said earlier that the software is basically a

10   sharing software.  Does the law enforcement software share?

11   A    No.  If I had to put into categories how we differ, law

12   enforcement can't share child pornography.  So all of our law

13   enforcement tools don't share.  We turn off file sharing to

14   ensure we're not part of the problem.  We do single-source

15   downloads.  So I am going to get the whole download.  Anything

16   I download comes from that one IP address I am investigating.

17   I'll ignoring any other download candidates that may be

18   available, and then the detailed logging.

19   Q    How many times would you estimate that you have taught

20   the certification class for this software?

21   A    Between 75 and 100 times.

22   Q    As part of teaching that class, do you have the

23   individuals taking the class go through some sort of

24   validation with regard to the locks that are provided?

25   A    Yes.  On top of having the software validated --

10:05:32:06AM validation tested ourselves, we make that part of the

2   curriculum.  So the last thing done in class is typically that

3   the investigator that I taught how to run the software and the

4   whole investigative process would actually conduct a test in

5   class to confirm that it's working properly.  And the key

6   points we want to make sure an investigator is confident and

7   can trust in this software is that this detailed log, for

8   instance, has to accurately record the dates and times.  It

9   has to accurately record the torrent file we're investigating.

10   And it has to accurately record the IP address that's sharing

11   the material to that.

12      So the way we do that is we have a server that is set up

13   sharing material.  It's not illegal, it's just pictures that

14   aren't copywritten.  It's innocuous material.  We have the

15   investigative software, and we actually investigate this

16   validation server.  And we download material.  So I can show

17   this to -- the software running, making a connection to a

18   computer.  I can show them the computer running a standard

19   BitTorrent client sharing data back to the investigative

20   software.  They get to see both ends of the communication.

21   It's as simple as noting the date and time and then looking in

22   the log-in verifying it's accurate, noting the IP address

23   sharing the material.  And the investigator can see the

24   connect and verify that it accurately records the IP address.

25   And then, finally, that it properly records that unique

10:07:08:15AM   identifier to the torrent.

2    Q    Based on the classes that you've taught, your personal

3    experience both as an expert and in the investigations that

4    you've done, have you ever found an instance where this

5    program has resulted in an error in terms of misidentifying

6    who it was taking from or how the system worked?  Is there an

7    error rate?

8    A    No.  I know of no instance.  It's a computer program.  It

9    does what it's supposed to.  It records the dates and times

10   accurately.  We set our time and clock on the computer.  It

11   uses that to record the dates and times.  Every class

12   concludes with a test, and it's always worked.

13   Q    Now, you've talked about the version that law enforcement

14   would use in the field.  Specifically, what steps do they have

15   to take from their end before they would begin their

16   investigation to operate the software?

17   A    Well, then they would need to install it on their

18   investigative computer when they get back to their office.

19   They're licensed to use the software.  They're issued a

20   license.  They input the license, and then they just configure

21   the software to investigate IP addresses seen by other law

22   enforcement through the searching of this network that appear

23   to be in their jurisdiction.

24       We do that through a commercial website.  It's called

25   MaxMind, M-A-X-M-I-N-D.  And they can take an IP address and

10:08:33:09AM   tell you what state it's in and, with pretty good accuracy,

2   what city they believe it's in.  That way we don't waste our

3   time.  I'm in Pennsylvania.  Why would I want to investigate

4   people in California?  It just helps us.  We don't rely on

5   those results except for to restrict and weed out the IPs I'm

6   not interested in.  That's where it ends, because I'm going to

7   rely on the subpoena results from the internet provider to

8   tell me exactly where that IP address is being used and who

9   the subscriber of that internet service was.

10   Q    So the individual in the field that's using the software,

11   would they then be opting for a particular location based on

12   what you've described in a particular person, I guess, based

13   on -- or identity?

14   A    Yeah.  They could just -- they could simply tell the

15   software, I want to investigate people in the U.S., and

16   investigate the whole country.  Or people in Pennsylvania.  Or

17   people in Pittsburgh, Pennsylvania.  And typically a lot of

18   times we just target at the state level and then I can

19   actually see the people.  If I was here in Oklahoma, I would

20   just look at the people in Oklahoma City.

21   Q    By doing that, do they then have a list of candidates in

22   their geographic area to choose from?

23   A    Yes.  And those are what I've equated to being anonymous

24   tips.  But, yes, it would be a list of IPs presented to the

25   software.

10:09:56:12AM  Q    Do they then take an action with regard to the candidates

2    if they want to look at a particular candidate?

3    A    Then they can download from them and review the

4    downloaded material, verify that it is, in fact, illegal.

5    There would be the detailed logs to confirm when those events

6    happened, when the file-sharing occurred.

7    Q    You discussed earlier that individuals can both download

8    or create their own torrents to obtain and put out these

9    particular materials.  Can you describe that for us?

10   A    And this is Vuze, actually, where I could point to a

11   single file, if you look two-thirds of the way down the image,

12   single file is selected.  Or directly full of files.  And

13   then -- it's a wizard.  I just hit next.  It would go through

14   and just create a torrent file.  The only step left at that

15   point would be to let my software run sharing these files that

16   I have just created a torrent for.  And then I would have to

17   get that torrent out to the world, so I do that through -- or

18   could do that through a website like The Pirate Bay.  I just

19   upload the torrent, and then it's immediately searchable by

20   users of that website.

21   Q    And can you describe to us exactly what is in a torrent?

22   A    So this is an example of what a torrent would be.  If a

23   torrent had three files in it -- tree JPEG, flower MPEG, and

24   ocean JPEG -- what happens is it actually -- if you can

25   picture those files all lined up in a row, and it will specify

10:11:26:21AM 1    how big each piece of data should be.  And those are the

2    pieces I was referring to as being traded.

3        So in this case, you can see that piece zero completely

4    encompasses tree JPEG and is actually the beginning of the

5    movie flower MPEG -- mpg.  So if I were to download piece

6    zero, I would have all of tree JPEG.  It's sitting in a folder

7    on my computer wherever I specified, and I could see it right

8    away.  It's available to me.  I don't need to have all the

9    pieces to see the files if there is multiple files in the

10   torrent.  I just need to have downloaded all the pieces

11   required for that file to exist completely on my system.

12       If I were to get all four pieces, I would have all four

13   files.  If I only had piece zero and piece three, I would have

14   completely downloaded two pictures, tree JPEG and ocean JPEG.

15   But yet I was missing a couple of pieces to complete the movie

16   flower.mpg.

17       So if you look below in the two boxes, the left box being

18   the information that is found in the torrent and then there is

19   actually example data to the right.  So one thing about the

20   BitTorrent network is that that unique identifier to the

21   torrent that we use when we go to trackers, for instance, to

22   find download candidates, it includes the -- that file hash of

23   the data, those pieces that you see above, piece zero, piece

24   one, piece two.  It uses the secure hash algorithm hashing

25   method.  It's very, very reliable.  It's used in computer

*DIRECT EXAMINATION OF ROBERT ERDELY*

10:13:10:03AM  1    forensics.

2         And the BitTorrent network actually uses that hashing to

3    identify the data that make up a torrent.  Where it's unique,

4    though, is that the -- the unique identifier to the torrent

5    not only is a hash of that data that is the files being

6    traded.  It actually includes the file names and the folders

7    that they live in.

8         So before I even start an investigation on the torrent, I

9    know how the files are named, I know what folder they live in,

10   and then I ultimately know the data.  And I can be as sure of

11   that as the secure hashing algorithm is the probability of it

12   being wrong, which is inconceivable the number is so great.

13        So that's just basically what makes up a torrent, which

14   is it will describe the folders they live in, the file names,

15   how big the files are, the number of pieces that make up a

16   torrent, how big each piece should be, and then the SHA-1 hash

17   of every piece of data.  We use this same hashing in computer

18   forensics.

19   Q    With regard to this particular testimony, did you receive

20   some materials from an individual names Chris Lamer prior to

21   your testimony here today?

22   A    I did.

23   Q    Did that consist of a series of six logs related to

24   torrents?

25   A    Yes.

10:14:45:03AM 1   Q    In talking with Detective Lamer, did you ascertain that

2   there was one torrent in particular to focus on with regard to

3   your testimony?

4   A    Yes.  I focused in on one of the six.  However, I

5   reviewed all six logs.

6   Q    And with regard to the logs, if you go to the next slide,

7   does this particular document have some relationship to the

8   logs that you received?

9   A    Yes.  This is one of the torrents that was investigated.

10  Q    And it appears that there are big, blue boxes at the top.

11  Can you tell us what, if anything, that is covering?

12  A    That's the unique identifier.  It's also referred to as

13  an info hash.  And it's a unique identifier to a torrent that

14  contains child pornography.  So we redacted the ending portion

15  because if you had that value, you could very easily seek out

16  that material on the internet and find the same torrent.

17  Q    With regard to this particular torrent, did you recreate

18  this based on the information that you got?

19  A    Yes.  I actually opened the exact same torrent that

20  calculates the same info hash.  And you can see the guts, so

21  to speak, that make up a torrent, what's inside.  I have made

22  it human readable using a program that also the university

23  developed for us.

24  Q    And what can you tell us about this torrent?

25  A    Well, it defines 36 different files and each piece should

10:16:10:03AM   be four megabytes, which makes it a very,very large collection

2   of file.  Almost nine gigabytes.  That's a lot of material.

3       There is comments, tells you where the torrent -- this

4   particular torrent was downloaded from.  Although it could

5   exist in many places on the internet.

6       Then on the files box -- I have one expanded, but it

7   tells you all the file names.  And then the second file down

8   it actually has expanded the information that is hidden.  So

9   you hit the little plus sign, and it tells me it's index one.

10   So meaning it's file one, but that's a little confusing

11   because the torrents are numbered starting counting at zero.

12   So the second file is actually named index one.

13       And then it tells how big the file is.  It tells you what

14   pieces that that -- this movie file lives in.  So if I was

15   able to download piece 275 through 457, then I would have that

16   whole file.  And immediately I could start viewing it.

17       And then you can see the folder lives in Web video

18   collection.  There is a backwards slash and then preteen,

19   space, HQ.  All of that is defined by the torrent.  And that's

20   the stuff the person downloading the material would see.  If I

21   load a torrent into my BitTorrent application, I'm going to

22   see those directly names and then I will see those file names,

23   because it's defined by that info hash.  It has to be.

24       Then you finally see all the SHA-1 hashes of every piece.

25   So you would have to scroll down, but there is 2,256 pieces in

10:17:49:09AM  1  this torrent.  So I have 2,256 SHA-1 hashes of every piece.

2       Then finally at the bottom is a list of those trackers.

3  If you think back to my earlier presentation where the

4  standard client would reach out to a tracker to find download

5  candidates, that's also in the torrent.  That's needed to make

6  it work.

7  Q    Again, when you say "reach out," is that something that

8  the user has to do in an affirmative step or is that something

9  the software is made to do?

10  A    Yeah.  BitTorrent clients automatically do it.  It's

11  not -- as soon as they double click a torrent and it loads

12  into their BitTorrent program, the stuff I am describing just

13  happens.

14  Q    Did you have -- also have an opportunity to make some

15  slides about the downloads -- the downloads within that

16  particular torrent as well?

17  A    I did.  So there were six torrents on March 18, 2015.

18  And I took excerpts of that log to explain what they mean.

19  And all six logs listed the IP address of the transfer as

20  being 68.97.10.183, port 6881.  So the IP address is unique to

21  the internet customer at that moment in time.  The port

22  actually will identify the program or application that is

23  running on that computer.  So if you think -- if you want an

24  analogy, the IP address could be compared to a home address.

25       A port would be what door or window would I want to enter

10:19:30:27AM the house through.  So, for instance, if I am a web server, I

2   am listening on port 80.  And on that same computer, I could

3   be a mail server and I am listening on port 25.  This

4   BitTorrent application was waiting for connections on port

5   6881.

6        In this detailed log, which is those good notes that I

7   spoke of, that the program takes for us during the undercover

8   session, it dates and time stamps the activity.  So on March

9   18th at 2:57 a.m., the download was added to the program as a

10  candidate, and the IP address and port being investigated were

11  just as I described.

12  Q    Is there anything else you need from this slide?

13  A    No.  It relates the current date and time back to UTC in

14  the middle entry, but that's all it does.

15       So then in that same log it's going to define what

16  torrent we're talking about.  This is that unique identifier

17  to the collection of files.  In the log it tells us how many

18  files are described by that torrent, how big the entire

19  collection of files would be if it was all downloaded, how

20  many pieces make up that torrent, and then how big each piece

21  is.

22       Then next.

23       So then what happens is it will go out and create the

24  directory structure on your computer.  And I like comparing

25  this to being an empty bucket.  So I need to create the

10:21:13:15AM  directory structure defined by the torrent just like the

2    standard client would, and it's an empty file.  There is no

3    data yet.  So that once a client starts sharing pieces with

4    me, I can spill that data right into the right bucket.  So

5    that's what's being showed here.  It says created

6    uninitialized file zero.  You can see the path is just like

7    the torrent described it as being.  And then we give that

8    first file a name that's also defined by the torrent.  We are

9    just following the instructions in the torrent.

10       At 2:57 a.m., on March 18th, a direct connection was made

11    from the investigative software to the sharing computer.  And

12    that's what the "connected" refers to.  This is the same type

13    of connection that a standard client would have.

14       Second line says:  Attempting to negotiate message stream

15    encryption with client.  Then the third line is saying it was

16    successful.

17       So BitTorrent clients -- modern BitTorrent clients, what

18    it will do is try to encrypt the communication between the

19    sharing computer and the connecting computer.  It's a standard

20    thing that happens in the normal software.  So we follow the

21    same rules.  If a piece of -- a client or an application we're

22    connected to wants to be encrypted, it can choose to be

23    encrypted.  Sometimes it doesn't choose to be encrypted so we

24    don't encrypt it.  It doesn't matter to us really.  But the

25    way that it's implemented, it would prevent someone in the

10:22:45:00AM 1  middle -- like the internet provider, if they wanted to snoop

2  on the communication, what's happening on my business, they

3  wouldn't be able to see what's happening between these two

4  sharing computers.  That's what that's about.  It's in the

5  log, so I thought it was worth mentioning.

6       So here is the portion of the log where we do that

7  handshaking, the client confirms, yes, I have that info hash.

8  I have that torrent that is very uniquely identified through

9  that string of letters and numbers.  The client supports

10 BitTorrent Fast Extension and then extended handshake.  I will

11 show you the extended handshake, I think, on the next slide.

12 Q    If I could stop you for a second.  When you are referring

13 to an "info hash," is the info hash the torrent?

14 A    It is the torrent.  It's a unique identifier to the

15 torrent.  It's actually a SHA-1 hash of all that information I

16 talked about:  The file names, the folders, the SHA-1 hash of

17 every piece of data.  So it's just another hash.  It's a SHA-1

18 hash.  Very reliable means of hashing.

19 Q    Okay.

20 A    Sent extended handshake message.  Sent "have none"

21 message.  So that is the investigative software basically

22 telling the computer we have connected to that we're not

23 willing to share any piece of data.  I told you that law

24 enforcement software, we can't -- we can't share.  None of our

25 software shares data back.  So that is a standard message on

10:24:16:15 AM 1   the BitTorrent network.  If the client I connected to had no

2   pieces to share with me, they would have said the same exact

3   thing.  "Have none."

4       Received a bitfield message.  So what that is -- and I am

5   just going to -- oh, it's down below.  There is 2,256 pieces.

6   So the bitfield message is the sharing computer telling me

7   exactly what pieces they have to share.  That way I can choose

8   to download the ones that I still need.  The standard

9   client -- maybe I already have half of the collection or I

10  have a thousand pieces.  So I am going to ask for those 1,200

11  missing pieces.

12      So that's part of the handshaking that happens.  And the

13  standard client -- and we do the same thing.  And literally --

14  it says bitfield message, but if you picture -- if you picture

15  2,256 positions, and each position could be a one or a zero, a

16  zero meaning I don't have it, a one meaning I have it, that's

17  literally what it is.  It's a bitfield message.  I don't have

18  piece zero but I do have piece one, I do have piece two, but I

19  do have piece three.  So now I can pick which ones I want.

20      And we summarize it by saying at this moment in time when

21  we first started this investigation -- I said "we," but it's

22  Detective Lamer -- there were 231 pieces possessed at that

23  moment in time.  So the sharing computer had about 10 percent

24  of the whole collection.  And there were 36 files in the

25  torrent.  So if I am just speaking in generalities, that means

10:25:53:21 AM 1    he probably had about 3.6 videos.  That's 10 percent of 36;

2    right?

3         Next slide.

4         So in the extended handshake, the one thing that's

5    interesting to me as an investigator -- but this is the

6    standard message that they send to any client, he will tell me

7    what version of software he is running.  That's important for

8    me to document.  We want to document all the information, but

9    I need to know as an investigator what kind of software the

10   individual is running because there is BitTorrent clients that

11   runs on mobile phones, Android applications, on Apple devices,

12   on Linux operating system or a Macintosh operating system or a

13   Windows operating system.  I need to know who I should bring

14   to a search warrant.  So that's something we document.  And

15   it's -- we are going to go in the door knowing that the

16   software claimed to be Vuze version 5.6.

17        And then once the pieces are downloaded, a SHA-1 hash is

18   made of every piece.  Because there was 2,256 pieces and

19   whatever number of pieces were downloaded in this case, I

20   would want to calculate the SHA-1 hash.  Then inside the

21   torrent was a list of all the piece hashes.  All piece zero

22   should be SHA-1 hash, whatever it was.

23        So by hashing the piece I downloaded from the sharing

24   client, I can compare it to what the torrent said it should

25   be, and I can verify with certainty that, yes, I got the

10:27:30:15AM 1  correct data.  It is, in fact, what the torrent says it should

2  be.

3  Q    And we are going along and apparently -- and you have

4  been talking about a lot of different pieces and different

5  things that are in the logs.  What you have laid out here, is

6  this basically a word for word what's in those logs?

7  A    There is more information.  I took out excerpts of all

8  the different types of communication you would see in the log.

9  Q    The log itself for something like this, would it be fair

10  to see it can run 800, 900, a thousand pages?

11  A    Yes.  Depending on -- this is nine -- almost nine

12  gigabytes of data.  It would be hundreds of pages most likely.

13  Could be even thousands of pages.  If it's a small video it

14  could be a dozen pages.

15      So then after we confirm that the pieces were accurate,

16  we can actually know what files we've completed the

17  downloading process of.  So file 31 was completed but yet I

18  didn't get all of the 32nd file.  In the 33rd file, no pieces

19  were received.  So the log will detail to us what files

20  completed the downloading process.  And all of the material

21  came from that one IP address we connected to.

22      Then finally we can calculate two different types of

23  hashes for all the completed downloads, and that's at the end

24  of the log.  So we calculate here the SHA-1 hash and MD5 hash.

25  It's just two different mathematical algorithms that we can

*DIRECT EXAMINATION OF ROBERT ERDELY*

10:29:06:21AM 1  pass data through that will spit out a fixed length

2  identifier.  It's going to be unique to that data regardless

3  of how the file is named.

4  Q    When you say that you can "calculate" it, is that

5  something that the law enforcement individual doing the

6  investigation does or is that something that the software

7  automatically does?

8  A    It's the same -- it's something the software

9  automatically does.  There are free programs out there that

10 you can download and hash a file that you just downloaded, but

11 we just automate the process.

12 Q    Could you look in front of you?  I believe there is

13 Government's Exhibit No. 2.

14 A    Yes.

15 Q    Can you tell me, is that a copy of the presentation

16 you've just done?

17 A    Yes.  It appears to be complete.  The only thing you

18 would be missing is the animations.  But, yes.

19          MS. BLACKBURN:  Your Honor, the government would

20 move to admit Exhibit 2.

21          MR. AUTRY:  No objection.

22          THE COURT:  It's admitted.

23          MS. BLACKBURN:  No further questions at this time,

24 your Honor.

25          THE COURT:  Cross-examination?

10:30:04:24 AM            MR. AUTRY:  Thank you, your Honor.

2                   **CROSS-EXAMINATION**

3   <u>BY MR. AUTRY</u>

4   Q    So, Detective, as I understand it, the Torrential

5   Downpour program that you talked about earlier, that's an

6   enhanced version of the BitTorrent program?  Is that right?

7   A    It is a BitTorrent application.  I just would want to

8   know what you mean by "enhanced."

9   Q    Well, it's not the same as the regular BitTorrent

10   application that's available to anybody in the public.  This

11   is some kind of proprietary software that modifies the

12   ordinary, for want of a better term, BitTorrent network.  Is

13   that correct?

14   A    It's designed -- well, I would say that all these

15   different BitTorrent programs -- and on the first sheet I

16   listed several of them -- they are all different.  They all

17   follow the BitTorrent protocol.  And the differences in ours

18   is -- I threw into those three broad categories.  So enhanced?

19   It's different, but all of them are different with different

20   features and options.  Ours doesn't share, ours takes good

21   notes, and ours -- detailed notes.  We don't -- oh, and we do

22   a single-source download, so we restrict our download from one

23   IP.

24   Q    All right.  So these -- I don't know, what do you call

25   these?  Applications?

10:31:26:09AM  A     Applications or programs.

2     Q     Okay.  Programs.   These are the ones that are available

3     to the general public; is that correct?

4     A     Those are some of them.   There's hundreds.

5     Q     Oh, okay.   And the Torrential Downpour program that

6     you've been talking about that is used exclusively by law

7     enforcement, it has those differences you talked about;

8     correct?

9     A     Yes.

10     Q     Okay.  And it's not available to the general public;

11     true?

12     A     No.

13     Q     Okay.  And you developed this particular software in

14     cooperation with the University of Massachusetts at Amherst;

15     is that correct?

16     A     Yes, sir.

17     Q     Okay.  So you actually helped develop it or create it?

18     A     Yes.  I wasn't the primary programmer of the tool.  I

19     worked with the developer that did.  I worked on the system

20     where law enforcement can share their search results with

21     other law enforcement --

22     Q     Okay.

23     A     -- the back end to the program.  So we worked together

24     day in and day out for quite some time to develop it.

25     Q     Okay.  And that's some kind of proprietary software;

10:32:27:27AM  correct?

2     A     Proprietary?  Yes.  Meaning that we have it and no one

3     else -- law enforcement has it.  We give it to law

4     enforcement.

5     Q     Okay.  You talked about training individuals to use this

6     particular program or this particular software.

7     A     Yes, sir.

8     Q     And do you know whether Detective Lamer, who conducted

9     the investigation in this case, is certified to use the

10    Torrential Downpour software?

11    A     In speaking with him, he told me the training that he was

12    at.  I don't have -- I didn't look up in the records of ICAT

13    training.  I just would be taking him at his word.

14    Q     All right.  So when Detective Lamer or whoever in law

15    enforcement throughout the United States is using this -- I

16    will call it an enhanced or modified version of the BitTorrent

17    network that's available exclusively to law enforcement --

18    when he is using that, it's not like he's sitting there at his

19    computer trying to access pieces of information from other

20    computers using an ordinary file-sharing program; right?

21    A     No.  It's automated like the standard program is

22    automated.  You load the torrent and it runs.

23    Q     Right.  But it's not like he is sitting there with a

24    standard version of the BitTorrent network looking for IP

25    addresses to people who have these particular torrents or

CROSS-EXAMINATION OF ROBERT ERDELY

10:33:47:03AM   particular files; correct?

2   A     No.  It uses the system I just described.

3   Q     All right.  And the system you just described differs

4   from the types of programs or software available to the

5   general public in that it allows you to isolate or focus on a

6   single source or a single IP address; is that correct?

7   A     Correct.  That's built into the program.

8   Q     All right.  And if I was on a regular BitTorrent network

9   and put in a search term looking for files of a particular

10   subject, I would have to be taking pieces of those files from

11   any number of different computers or peers; is that right?

12   A     Well, you said "have to," so I would disagree with that.

13   Q     Well, isn't that generally how it works?

14   A     The standard client can download from multiple clients,

15   probably does prefer because it would speed up the download.

16   If there was only one sharing client out there, it would

17   download the whole thing from one client.  And I did describe

18   in my testimony how you could use a standard program like Vuze

19   and also make it a single-source downloading program by adding

20   an IP filter.  But you said has to, so that's why I disagreed.

21   Q     Okay.

22   A     That's why I disagree with your question.

23   Q     Okay.  Well, here is where my confusion comes in.  You

24   say that somebody could get a standard piece of software or

25   computer equipment that would allow you on a file-sharing

10:35:13:06 AM program to download from a single source; right?

2    A    Yes, sir.

3    Q    And the enhanced program, Torrential Downpour, allows you

4    to download from a single source; right?

5    A    Yes, sir.

6    Q    Okay.  So what's the difference then?  If I can, you

7    know, use some kind of ordinary software that I can get just

8    as a citizen or a consumer and download from a single source,

9    why do you need this super fancy enhanced version of the

10    network?

11    A    Well, I am not sure what you mean by "super fancy."

12    Q    Well, okay.  That's -- I am not describing it that well.

13    A    Okay.

14    Q    But the -- what I will call the proprietary law

15    enforcement software.  You are not telling the Court that the

16    proprietary law enforcement software is identical to what's

17    available to the general public, are you?

18    A    No.  Actually, I described that all these are different,

19    every single one, of the ones available to the general public.

20    They are all different in different respects.  But to go to

21    your question that was before that, that preceded that, is

22    that the fact that we developed the software to only download

23    from one IP address basically removes any possibility of

24    error.  We've tested it.  It's built right into the program.

25        Again, we are more restrictive on ourself.  We download

CROSS-EXAMINATION OF ROBERT ERDELY

10:36:32:06AM from one IP instead of multiples.  That can happen normally on

2   the network.  If only one person is sharing the torrent, I

3   would get it from one person or I could ensure it through

4   using a second piece of software where I could just punch an

5   IP address in and say only communicate with that one IP.

6       So our software is different absolutely.  The program is

7   designed to just download from a single IP.  I just was

8   illustrating to the Court that anyone can do it --

9   Q   Right.

10  A   -- with software that's already out there.  They don't

11  even have to develop it.  It's already out there.

12  Q   Okay.  In this particular investigation -- well, let me

13  back up.  Were you personally involved in this particular

14  investigation?

15  A   I was not.

16  Q   All right.  Do you have any knowledge as to whether or

17  not in this particular investigation Detective Lamer

18  downloaded torrents from a single source, one computer, using

19  the law enforcement software?  Or was it from multiple

20  sources?

21  A   I reviewed the logs generated in this investigation.  And

22  if I'm allowed to speak of that, then I would say I know that,

23  yes, he was running Torrential Downpour and, yes, he

24  downloaded from a single IP address.

25  Q   Okay.  Because that's what Torrential Downpour is

10:37:53:21 AM 1 designed to do, is to download from a single address rather

2 than from multiple addresses; correct?

3 A    Correct.  I looked at the logs.

4 Q    All right.  And that's one of the things that makes the

5 program or the software somewhat unique; right?

6 A    Somewhat unique, yes.

7 Q    All right.  And the other thing that makes it somewhat

8 unique is that it creates a detailed log; is that right?

9 A    Correct.

10 Q    Okay.  And the ordinary, I guess, file-sharing software

11 on the BitTorrent network does not create that detailed log

12 that this law enforcement software creates; right?

13 A    Well, I can't speak for every program out there.  There

14 is logging events in different applications.  But, generally

15 speaking, I mean, I know of no other application that builds a

16 log, and certainly I would doubt that there is any one exactly

17 like that.  But there is logging built into programs at times.

18 Q    Okay.  And what are the other differences, if any,

19 between the Torrential Downpour law enforcement program and

20 the ordinary file-sharing program that the ordinary person can

21 access?

22 A    Well, I have described them, all of the differences, in

23 my testimony.

24 Q    All right.  Are the two things that we just went over,

25 are those the two main differences isolating --

10:39:08:24AM A    Three.

2      Q    Okay.  Give me the third one then.

3      A    Well, we don't share --

4      Q    All right.

5      A    -- we download from a single IP, and we take a very -- we

6      make -- create this detailed log that acts as evidence in the

7      investigation.

8      Q    It's a lot more efficient, I guess, in terms of an

9      investigation to be able to download from a single IP or a

10     single source; right?

11     A    Efficient?  No.  I would say it's less efficient than the

12     standard program.  The standard program downloads from

13     multiple sources downloading very quickly, getting me my

14     material very quickly.  It's less efficient because I am --

15     it's a slower process.  I am downloading from one IP address.

16     I am just asking the same IP over and over again for the next

17     piece of data.  So it's less efficient.  We are more

18     restrictive on ourself than the standard client is because we

19     are going to download from one IP versus many.

20     Q    But if you are targeting a particular individual, I mean,

21     that's one of the benefits of the program.  You can isolate on

22     one computer, one IP address, one sharing source, and things

23     of that nature; correct?

24     A    Absolutely, yes.

25     Q    Okay.  Now, do you have a financial interest in marketing

10:40:19:12AM  this particular piece of enhanced or proprietary software to

2  law enforcement agencies?

3  A    No.  The software is free.

4  Q    Okay.  The software is free?

5  A    Yes.

6        MR. AUTRY:  Could we bring up Exhibit 2, please.

7  Could we go to page seven?

8  Q    (By Mr. Autry) Now, could you describe again for me,

9  Detective, what this document is exactly?

10  A    That is looking inside a .torrent file.  At the top you

11  see a line that says "info hash"?

12  Q    Yes, sir.

13  A    That's the unique identifier to that torrent.  And this

14  acts as instructions to a program on how to download this

15  material.  This is one of the six torrents that was

16  investigated by -- investigated by Detective Lamer.

17  Q    Okay.

18  A    I don't know his rank.  I believe he is a detective.

19  Q    Yes, sir.

20  A    And to be clear, if I were to load this torrent into a

21  program like uTorrent or Vuze, you would see a lot of the same

22  information.  It's the instructions.  So a standard program

23  can show it.  However, this one is our own viewer of torrents.

24        So then you see how many pieces make up the torrent.

25  Each piece is going to be part of a file or files.  You can

10:42:06:18AM   see how big each piece is.  It's four megabytes.  In this

2   collection of files, whoever created this torrent chose to

3   include 36 files, so there is 36 files defined by this

4   torrent.  And the total size, if you were to add all of those

5   36 files together, it would be 8.81 gigabytes.  A very large

6   collection.

7   Q    Okay.  And this particular page of the document doesn't

8   contain any kind of identifying information as to what IP

9   address this stuff was accessed from; is that correct?

10   A    No.  This is the torrent, the instructions.  Then you

11   would have to load it into a BitTorrent application and find

12   download candidates.  That was part of the other slide.

13   Q    Oh, okay.  Is the software that's used by law

14   enforcement, this Torrential Downpour software, does it have

15   to be calibrated or anything done with it before it's utilized

16   in a particular investigation on a particular day?

17   A    No, it doesn't need calibrated.  We test it, it runs.  It

18   runs the same way all the time.

19   Q    How often does it have to be tested?

20   A    We test it -- we had a validation test done independently

21   and we test it after the individuals trained, and that's the

22   only testing required.  Can people test it more?  Sure.

23   Q    Okay.  So there is not a test or a validation test that's

24   done every time a law enforcement officer utilizes the

25   Torrential Downpour software to conduct an online

10:43:36:15AM 1   investigation to see who is trading or possessing child

2   pornography?

3   A    No.  It's not like an Intoxilizer.  I think that's what

4   you're asking.

5   Q    Okay.  You probably have submitted numerous affidavits

6   for search warrants in child pornography investigations.

7   A    Yes, sir.

8   Q    And when you submit an affidavit or a search warrant

9   where you've used the Torrential Downpour program, do you

10  indicate that a special proprietary law enforcement piece of

11  software was used to conduct the investigation?

12  A    No.

13  Q    You do not?  Why not?

14  A    I don't think there was a need.  I indicate that I use a

15  BitTorrent piece of software and that the entire download came

16  from a single sharing client.  Those are important facts a

17  judge would need to know --

18  Q    All right.

19  A    -- when deciding whether or not I've established probable

20  cause.  The name of the software, I didn't feel it to be

21  relevant.

22  Q    All right.  Why is there some kind of a privilege that

23  attaches or some kind of law enforcement privilege that

24  attaches to this particular software in light of the fact that

25  the -- you're claiming it only does a couple of different

10:44:55:12AM  things than the ordinary file-sharing software would do?  Is

2  there a particular reason that it's inaccessible to the

3  public?

4          MS. BLACKBURN:  Objection.  Beyond the scope of this

5  particular motion.

6          THE COURT:  That is true.  That wasn't gone into.

7          MR. AUTRY:  All right.

8      Thank you, Detective.

9          THE COURT:  Any further direct examination --

10  redirect rather?

11          MS. BLACKBURN:  No.

12          THE COURT:  All right.

13      I don't believe I have any questions for you.  Thank you,

14  sir.  You may step down.

15          THE WITNESS:  Thank you, your Honor.

16          THE COURT:  Government, anything further from your

17  side?

18          MS. BLACKBURN:  No.

19          THE COURT:  Mr. Autry?

20          MR. AUTRY:  We would call Detective -- excuse me --

21  Agent Kari Newman.

22          THE COURT:  Ma'am, please come forward, stand in

23  front of the witness chair and be sworn.

24      (The witness was duly sworn.)

25          THE CLERK:  Please be seated.

*DIRECT EXAMINATION OF KARI NEWMAN*

10:46:32:15 AM | **KARI NEWMAN,**

2   called as a witness herein, having been first duly sworn,

3   was examined and testified as follows:

4   **DIRECT EXAMINATION**

5   BY MR. AUTRY

6   Q    Could you state your name for the Court, please, ma'am.

7   A    Kari Newman.

8   Q    I'm sorry.  I mispronounced your first name.  Car-ry, not

9   Care-ry?

10   A    Yes, sir.

11   Q    And could you tell the Court what you do for a living?

12   A    I am a special agent for Homeland Security

13   investigations.

14   Q    Located in Oklahoma City?

15   A    Yes, sir.

16   Q    Are you the case agent in this particular investigation

17   against Mr. Maurek?

18   A    I am.

19   Q    And you are the affiant on the search warrant; is that

20   correct?

21   A    Yes, sir.

22   Q    You put the affidavit together?

23   A    Yes, I did.

24   Q    And it was based both on your training and experience and

25   on information you received from Detective Lamer of the Moore

10:47:09:15AM  Police Department; is that correct?

2    A    Yes.

3    Q    Were you working with Detective Lamer at the time he was

4    doing his internet searches or file-sharing searches that led

5    to the evidence discovered in this case online?  Or did he

6    contact you after he did all that?  How did that work?

7    A    He contacted me after the downloads took place.

8    Q    All right.  And the affidavit for search warrant, did you

9    indicate at all that a proprietary law enforcement piece of

10   software was used to access Mr. Maurek's computer?

11   A    I don't believe I did.

12   Q    Or that this was a sole source access using this kind of

13   law enforcement software that's not available to the general

14   public?  Did you indicate that?

15   A    The affidavit indicated that it was a single-source

16   download --

17   Q    Uh-huh.

18   A    -- from a single IP address.

19   Q    All right.  But as far as the exact software that was

20   used or the type of software that was used, that was not

21   discussed in the affidavit; is that correct?

22   A    There was a description of how the BitTorrent and

23   BitTorrent downloads take place.  As far as the name of the

24   software, no, it was not included.

25   Q    Okay.  What I am really getting at is there was nothing

*DIRECT EXAMINATION OF KARI NEWMAN*

10:48:24:06 AM 1  in the affidavit that says rather than just using the ordinary

2  BitTorrent network to conduct searches for people who possess

3  child pornography on the network, that, in fact, an enhanced

4  or modified version of the BitTorrent network exclusive to law

5  enforcement was the tool used in this investigation.  That's

6  not stated; correct?

7  A    That was a really long question.  I am sorry.

8  Q    It was more of a speech than a question.  I apologize to

9  you.

10      What was not stated in the affidavit was that this

11  investigation utilized specialized modified software that's a

12  variation of the BitTorrent network but is used exclusively by

13  law enforcement.  That was not stated; correct?

14  A    I don't believe so.

15  Q    All right.  Now, the search of Mr. Maurek's apartment was

16  conducted on May 5th of this year?

17  A    That sounds right.

18  Q    Okay.  And the warrant limited the search to Mr. Maurek's

19  apartment for computer equipment and things of that nature;

20  correct?

21          MS. BLACKBURN:  Objection.  Beyond the scope of the

22  motion.

23          MR. AUTRY:  Your Honor, I received some information

24  that law enforcement -- since the motion was filed that law

25  enforcement went through Mr. Maurek's truck at his residence.

10:49:50:21AM 1   That would be outside the scope of the warrant, which was

2   simply for his apartment.  I am trying to establish, to the

3   extent I can through this witness, whether that occurred or

4   not.

5          THE COURT:  Overruled.

6          MR. AUTRY:  Okay.  Thank you.

7   Q    (By Mr. Autry) You were not present during the actual

8   search?  Or were you?

9   A    Of the apartment?

10  Q    Yes.

11  A    Yes.

12  Q    You were present?

13  A    Yes.

14  Q    Oh, okay.  And how many other officers were present with

15  you?

16  A    Maybe eight -- seven or eight.  I don't remember off the

17  top of my head.

18  Q    All right.  And Mr. Maurek was not present at the

19  apartment when you arrived with the warrant; correct?

20  A    Correct.

21  Q    You talked to somebody who was like a manager of the

22  apartment complex to gain access to the apartment to serve or

23  execute the warrant?

24  A    We obtained the keys so we wouldn't have to destroy

25  property any more than necessary.

*DIRECT EXAMINATION OF KARI NEWMAN*

10:50:45:24 AM    Q    All right.  And when you went through the apartment, you

2    gathered computer equipment, a camera, and some paper

3    documents; right?

4    A    That sounds correct.

5    Q    Okay.  It's on the return.

6    A    Yes.

7    Q    But -- everything you gathered from the apartment was on

8    the return.

9    A    Yes.

10    Q    Okay.  Now, Mr. Maurek had a vehicle in the parking lot

11    of the apartment complex?

12    A    I believe he did, yes.

13    Q    Okay.  Do you remember what kind of vehicle that was?

14    A    I think it was a truck.

15    Q    Do you remember what color it was?

16    A    I want to say white.

17    Q    Okay.  And y'all went out and looked at the truck; right?

18    A    We looked at -- yeah.

19    Q    Somebody got in the truck, didn't they?

20    A    I couldn't say if somebody got in the truck.

21    Q    You can't deny it either, can you?

22    A    I did not get in the truck and I did not see anyone else

23    get in the truck.

24    Q    Okay.  Did you look inside the truck?

25    A    I'm sure we looked through the windows to see if there

10:51:42:00 AM   was anything in plain view.

2    Q    Did you look in the bed of the truck?

3    A    I have no idea.

4    Q    Okay.  How many officers were looking in the truck or

5    looking at the truck?

6    A    I do not know.  I was not out there.

7    Q    Okay.  Did you direct any officers to look at or in the

8    truck?

9    A    I believe I asked somebody -- I do not remember who -- to

10   check the truck, see if there was anything in plain view that

11   would indicate a need to get a further search warrant for the

12   truck.

13   Q    When you say check to see if there is "anything in plain

14   view," did that imply that they could open the door -- the

15   truck door and kind of look around to see if there was

16   anything in plain view?

17   A    I could not speak to what they would infer from that.  I

18   am not them.

19   Q    Okay.

20   A    I asked that the truck be checked for anything in plain

21   view, which, in my mind, would be from outside the truck.

22   Q    Did they check the truck?

23   A    As far as I know.

24   Q    Okay.  Was anything taken from the truck?

25   A    No, sir.

*DIRECT EXAMINATION OF KARI NEWMAN*

10:52:45:18AM  Q    Was anything seen by plain view or otherwise in the truck

2   that you thought might have evidentiary value?

3   A    No, sir.

4   Q    Did anybody move the seats of the truck or anything like

5   that?

6   A    I have -- I don't know.

7   Q    Okay.  Was the truck locked or unlocked?

8   A    I do not know.

9   Q    All right.  Did you have any kind of conversation with

10  any agents after you or somebody directed them to look at the

11  pickup truck as to what they did or what they saw or anything

12  like that?

13  A    My recollection is at some point somebody said the truck

14  is clear.

15  Q    The truck is clear?

16  A    Meaning there is nothing further.

17  Q    All right.  Now, the application for the search warrant

18  that you did or the affidavit and the application and the

19  search warrant itself limited the search to Mr. Maurek's

20  residence, didn't it?

21  A    Yes, sir.

22  Q    It did not extend to any vehicles he may have had on the

23  property; correct?

24  A    Correct.

25  Q    All right.  Well, to the extent that the warrant was

*DIRECT EXAMINATION OF KARI NEWMAN*

10:53:48:06AM  limited in that way, what reason would there be for you to

2  direct other agents to look at the truck?

3  A    The truck was in a public space.  Anybody in the public

4  could go and look in the windows.

5  Q    Okay.

6  A    And, therefore, that would allow us to do the same.

7  Q    Okay.  Could anybody in the public open the door of the

8  truck and climb inside?

9  A    I suppose if the doors were unlocked that would be

10  possible.

11  Q    Okay.  Was there any kind of tarp or any kind of covering

12  of things in the bed of the truck that you're aware of?

13  A    I -- I don't know.

14  Q    You indicated that you did not personally look in or at

15  the truck but you were aware that the truck was there; right?

16  A    Yes, sir.

17  Q    Okay.  Did you look in it or anything like that?

18  A    No, sir.

19  Q    Okay.  How many agents went out to look at the truck or

20  in the truck?

21  A    As I stated before, I do not know.

22  Q    I'm sorry.  I probably asked you that before.

23  A    You did.

24  Q    Okay.  Thank you, Agent.

25          THE COURT:  Cross-examination?

10:55:01:06 AM          MS. BLACKBURN:  No.

2                THE COURT:  Thank you, ma'am.  You may step down.

3                THE WITNESS:  Thank you, your Honor.

4                THE COURT:  Mr. Autry?

5                MR. AUTRY:  No further evidence, your Honor, at this

6       time.

7                THE COURT:  Mr. Autry, do you care to present

8       argument?  I have read all the briefing, just to let you know.

9       But if you would like to present anything --

10               MR. AUTRY:  Your Honor, we basically stand on our

11      brief.  I am trying to get to the bottom of whether or not

12      anybody actually went in the truck.  That's why I called Agent

13      Newman.  The Court has heard that testimony.

14          But the Court has got the briefs and the arguments, and

15      we don't have anything additional to add.

16               THE COURT:  All right.

17          Government counsel, anything additional?

18               MS. BLACKBURN:  No.

19               THE COURT:  All right.  Very well.

20          Thank you all.  And I will endeavor to get an order out

21      in this matter as soon as possible.

22          With that, court is in recess.

23

24               (Proceedings concluded at 10:55 a.m.)

25

CHRISTINA L. CLARK, RPR, CRR
United States Court Reporter
200 N.W. Fourth Street, Suite 5419
Oklahoma City, Oklahoma  73102
christina_clark@okwd.uscourts.gov - ph(405)609-5123

10:55:55:09 AM · · · · · · · · · CERTIFICATE OF OFFICIAL REPORTER

· · · 2· · I, Christina L. Clark, Federal Official Realtime Court

· · · 3· · Reporter, in and for the United States District Court for the

· · · 4· · Western District of Oklahoma, do hereby certify that pursuant

· · · 5· · to Section 753, Title 28, United States Code that the

· · · 6· · foregoing is a true and correct transcript of the

· · · 7· · stenographically reported proceedings held in the

· · · 8· · above-entitled matter and that the transcript page format is

· · · 9· · in conformance with the regulations of the Judicial Conference

· · 10· · of the United States.

· · 11

· · 12· · · · · Dated this 1st day of July, 2017.

· · 13

· · 14· · · · · · · · · · · · · · · s/CHRISTINA L. CLARK_____
· · · · · · · · · · · · · · · · · · Christina L. Clark, RPR, CRR
· · 15

· · 16

· · 17

· · 18

· · 19

· · 20

· · 21

· · 22

· · 23

· · 24

· · 25

CHRISTINA L. CLARK, RPR, CRR
United States Court Reporter
200 N.W. Fourth Street, Suite 5419
Oklahoma City, Oklahoma· 73102
christina_clark@okwd.uscourts.gov – ph(405)609-5123